LAWRENCE *v.* CITY OF GRAND RAPIDS.

1. MUNICIPAL CORPORATIONS—TAXATION — SEWERS — DISTRICT AS SESSED—COMMON COUNCIL.
    Where the common council of a city determined the boundaries of a sewer district as a basis for a special improvement tax, without reference to known and ascertainable facts concerning the property benefited, its occupancy, boundaries and the buildings thereon; the lines of the district dividing lots, buildings and houses, and failing to include lands benefited by the proposed sewer, the action of the council was arbitrary and invalid.

2. TAXATION—SPECIAL ASSESSMENTS—PUBLIC IMPROVEMENTS—ASSESSMENT ACCORDING TO BENEFITS.
    An assessment of all property within a sewer district in proportion to its area, without differentiating land benefited by direct access to the sewer from land that received advantages only by reason of surface drainage, or from land that could not be connected with the sewer except by crossing other private property, is erroneously apportioned.

3. SAME—CONCLUSIVENESS OF ASSESSORS' CERTIFICATE.
    Neither the certificate of the assessors that they assessed the property in accordance with benefits, nor the confirmation thereof by the common council, is conclusive.

4. SAME—ESTOPPEL — APPEAL FROM DETERMINATION OF COUNCIL.
    No estoppel bars taxpayers in a sewer assessment district from having relief in a court of chancery from an invalid assessment, on the theory that they did not appeal from the action of the common council in fixing the assessment district, or that they did not tender a part of the cost of the improvement, where no method of appeal is provided and they had no means of determining a proper amount to tender.

5. SAME.
    Nor were they estopped on the ground that they stood by without objection while the improvement was under construction, since they did not own property fronting on the sewer and had no notice that their property was included in the district until the sewer was nearly completed.

Appeal from the superior court of the city of Grand

Rapids; Stuart J.  Submitted February 8, 1911.  ( Docket No. 8.)  Decided June 2, 1911.

Bill by John S. Lawrence and others against the city of Grand Rapids and another to set aside a special assessment.  From a decree for complainant, the defendant the city of Grand Rapids appeals.  Affirmed.

*Albert Crane,* for complainants.

*Moses Taggart* and *Clark E. Higbee,* for defendant.

OSTRANDER, C. J.  Sixteen persons affected by a sewer tax, the roll for which was in the hands of the city treasurer of the city of Grand Rapids for collection, filed their bill against the city and the treasurer thereof, asking that the proceedings for the levying and collection of the tax and the said tax and assessment be decreed to be illegal and invalid, and that the defendants be enjoined from any further attempt to enforce the collection thereof.  The defendant city answered the bill.  There was the usual replication, and the cause came on to be heard upon the pleadings and proofs taken in open court as in a suit at law.  A decree was entered adjudging the assessment district described in the bill to be illegal and invalid, the assessment and assessment roll to be illegal and invalid, and perpetually enjoining the defendants from collecting the unpaid assessments.  The decree is without prejudice to the right of the city to locate a new assessment district and make a new assessment of property therein.  The defendant city has appealed.

The several contentions of appellant, as we view them, amount to this: That a special assessment district was legally designated and the special assessment upon the property within the district to meet the cost of the improvement was legally made.  If not, certain, if not all, of the complainants are estopped to take advantage of the illegal action complained about.

We shall consider, *first,* whether an assessment dis-

trict was properly designated or whether the action of the council in fixing the boundaries thereof was arbitrary and therefore illegal; *second*, whether an assessment according to benefits within the meaning of the charter provisions was made; *third*, if either the fixing of the district or the assessment roll is found to be illegal, whether any of the complainants are estopped to question the validity of their respective assessments.

1. It is the duty of the common council under the charter, when a special improvement is made, the benefits accruing from which are regarded as local, to determine the boundaries of the district within which the property is supposed to be specially benefited by the improvement, and the district having been fixed by the common council and the cost of the improvement ascertained, or estimated, it is the duty of the board of assessors to apportion the cost of the improvement within the district upon all owners or occupants of lands or houses within said district in proportion as nearly as may be to the advantage each shall be deemed to acquire by the making of such public improvement. The carving out of a special assessment district in a city is a practical matter, depending wholly upon facts, and, if the improvement is a sewer, it cannot be supposed that the governing body can ever fix the boundaries of the district precisely in accordance with the boundaries of property which in opinion or in fact receive some special benefit on account of the improvement. It is the general rule that when a common council has in good faith, with reference to ascertainable facts, defined such a special assessment district, its conclusion in the premises is final.

It is claimed in this case that the council did not act with reference to the known or ascertainable facts, but in a wholly arbitrary manner, in fixing the boundaries of the particular assessment district. This brings us to an examination of what the record discloses upon this branch of the case. The district in question was located with respect to an improvement which consisted of the recon-

struction of a part of the East Fulton street sewer.   East
Fulton street in the city of Grand Rapids may be de-
scribed generally as a way running nearly east and west,
built for a considerable or the greater part of its length
upon the side of a hill.   The land to the north of it (up
the hill) is higher than the roadway, and the land to the
south of it (down the hill) is lower than the roadway.
The entire area of the land involved here lying east of
Jefferson street is drained naturally to the south, or, in
the northern part of the district, to the south and east.
Dwellings fronting upon the street on the south side
thereof have, many of them, ground floors level with or
below the level of the street, and their rear or south walls
a considerable distance, sometimes the height of a story,
above the level of the ground.   From Jefferson street
west, this abutting land is more nearly upon the same
level as the street.

For many years a sewer had existed in East Fulton
street, its mouth being at Division street, and its begin-
ning a short distance west of North College street.   Open-
ing into Fulton from the south are Division, Sheldon,
Lagrave, Jefferson, Lafayette, Prospect, Gay, and from
the north Division, West Park, East Park, Ransom, Bar-
clay, North Lafayette, North Prospect, all within the dis-
trict traversed by the sewer as originally laid.   The en-
larging and deepening of the sewer began at Division
street and was continued to, or near to, Barclay street.
No lateral sewers enter Fulton street sewer from the
south, but there are laterals opening into the sewer from
the north from Barclay, from North Lafayette and from
North Prospect street.   The city engineer, whose testi-
mony upon this point is undisputed, said:

" The sewers carry away not only sewage but surface
water.   After streets have been paved the water flows
away more rapidly, and we put in more catch basins now
than we used to; the water gets into the sewers quicker.
As the lawns are improved the water runs off more quick-
ly, and a large amount reaches the sewers.   The changes

in the pavement of streets from the old gravel to the new pavements and the building of lawns on the lots occasion a large flow of water and require larger sewers than were required originally. We are now figuring our sewers to-day four or five times larger than the old ones, depending upon conditions; the surface water as well as the sewage is anticipated. The house sewage is a secondary matter, and is a very small percentage of the whole. The amount of increase by reason of the paving of streets and their improvement cannot be estimated very closely, but we figure four or five times as large canal as under old conditions."

It was in the office of the city engineer that the map used by the committee of the council which considered the location of the district was prepared. It is apparent from the testimony and from the map which is a part of the record that the council undertook to fix a district, with the aid of the engineer, embracing property the surface drainage of which, conducted by way of streets, lateral sewers, and otherwise, would reach the East Fulton street sewer, and to embrace also property which by reason of its contiguity to the sewer could be directly connected with the sewer. For the greater portion of the distance on the south side of East Fulton street the south boundary of the district is fixed 100 feet south of the street. On the north side of the street, and at the eastern end of the district, it is for a considerable distance limited to 100 feet north of Fulton street. Then the boundary line is extended north to within 100 feet of Fountain street, which appears to be the first street to the north of East Fulton upon which there is an east and west sewer, and which is about 762 feet north of Fulton. Paralleling Fountain street, the boundary runs west 100 feet from the street to a point about 100 feet west of Ransom street, thence south and west, and thence southwest and irregularly northwest to Division street, which is the mouth of the sewer. Complainants say with respect to this district that there is a considerable area of territory, which naturally drains into this sewer and must do so because it can have neither

drainage or sewerage in any other direction, which has been omitted from the district, while other property within the district as fixed receives, and can receive, no possible benefit from the improvement. The boundary line of the district traverses the property of various owners without regard to the boundaries of the property and intersects dwellings and buildings devoted to business. As indicating the manner in which the boundary line of the assessment district intersects property, and also as indicating the extent of property draining into the sewer omitted from the assessment roll, we set out here some of the undisputed testimony upon the subject:

"Beginning at the east end of the district on the north side of Fulton street, there is the Hughart property; about a quarter of that property is in the district. The whole property drains into this sewer and can't drain into any other place. About a fourth of the house on that property is in the district and the balance of the house outside of the district. On the same side of the street next west is the Boshea property now owned by John W. Blodgett; all of that property drains into the Fulton street sewer and can't drain to any other point; the entire house is outside of the district and about ¾ of the lot. The Shanahan property is next to the west; the only portion of the house within the district at all is a foot or two of the front porch; the whole house is outside of the district and about ¾ of the lot; all of that property can only drain into Fulton street. The next is the Gorham property in which case all of the house is outside of the district and about ¾ of the lot, neither of which could drain anywhere else excepting to Fulton street sewer. Next is the T. Stuart White property which lot and house can only drain into this sewer; ¼ of the house is within the district, and the balance of the house and about ¾ of the lot is outside. These lots all along there are approximately 400 feet deep and there is a front; 100 feet is in the district, the balance is outside. The next property is the Blodgett's, and ¼ of the entire property is outside of the district, and also outside is his barn in which there is a family living; a portion of the house is also outside of the district. That property could only drain into the Fulton street sewer, Prospect being a lateral. Mrs. Worden's property is north

of the Blodgett property, and ½ approximately of that
lot is outside of the district and the barn is out of
the district, while the whole property drains to
Prospect street. Next north of that is the Rood prop-
erty which drains to Prospect street and can go no-
where else; a portion of his house and rear half of his
lot is out of the district. Next north of that is Mr.
Stickley's property. A portion of his house and the rear
half of his lot including the barn, is outside of the district.
There is no possible drainage for that lot except into Pros-
pect street. Next to that is the Studley place. The rear
half of the lot, including the barn and rear half of the
house is outside of the district entirely. That drains to
Prospect street. Coming west there is the rear ⅓ of Mrs.
Crosby's place now occupied by Owen Chaffee who pur-
chased it. The part of the Crosby lot which is in the dis-
trict can't get to any sewer running into Fulton street at
all without crossing private property. At Barclay street
there is the Methodist church parsonage on the east side
of the street. That is divided longitudinally by the north
line of this district; part of the house being in the district
and part out. The whole of that property drains into
Barclay street and could go nowhere else. It is so low
they could not possibly get to Fountain. Next west is the
Hoffman flats, a six-story apartment building. That is
divided by the north line of the district, ⅓ of the building
being in the district, and ⅔ out. That building drains
into Ransom street and couldn't possibly drain elsewhere.
The Gillespie property, the bishop's residence, fronts on
Fountain street. About the rear ⅓ of that property is
assessed in this district and that portion of the lot couldn't
by any possibility be drained into the Fulton street sewer
without crossing other private property. And the same
thing is true of the one at the rear, ⅓ of the J. C. Wen-
ham lot which adjoins the bishop's residence on the east.
The school of the Sisters of Dominic is a property which
might drain into Fountain street or into Ransom street or
both, and about ⅓ of the building and ⅔ of the barn on
that property are in the district, and the balance of the
building outside. The Birch property on the corner of
North Park street and Ransom is divided by the west line
of the district, a small portion of that building being out-
side of the district and the balance inside. About ⅓ of
the Park Congregational church building is in the district
and ⅔ outside. At the corner of Sheldon and East Fulton

streets are the Press and Herald buildings, both of which front on the sewer, and they are not in the district at all. A part of the Watson residence, the house, is outside of the district. A portion of the house on the rear of the Blake & Maris property is about ¼ in the district and ¾ out. Half of the Wellington flats is in the district, and the other half out. A portion of Mrs. Ransom C. Luce's residence is in the district and a portion out. Part of the Platte residence is in the district and part out. Part of the old White place is in and part out. Part of the M. L. Sweet place is in the district and part out. Paul Steketee's residence is divided longitudinally by the line of the district about half and half; while William H. Gay's house is cut in two in the middle by the line of the district, and so is Mr. Morman's. Mr. Gay's, Steketee's, Morman's, Aldworth's and Leonard's residences on the south side of Fulton street are all divided by the line of the district; part of them inside and part outside.

"Witness is asked to take the map and, commencing at the east end of the East Fulton street sewer, to tell what property which drains into the sewer and must be so has been omitted from the assessment roll.

"Beginning with the Hughart property which is described as part of section 30—7—11, a part of lot 8 Coit & Curtis partition plat, commencing on the north line of East Fulton street 362.82 feet east of the north and south quarter line of said section, thence north 356 feet, east 134 feet, south 110 feet, east 16 feet, south 246 feet to the north line of East Fulton street, west to beginning. The next is the J. W. Blodgett property, part of section 30—7—11, commencing on the north line of East Fulton street 215.82 feet east of the north and south quarter line of said section, north 406 feet, east 147 feet, south 406 feet to the north line of East Fulton street, west 147 feet to beginning. The R. E. Shanahan property is described as the east half of the east half of the south half of lots, 1, 2, and 3 Coit & Curtis partition plat. The Gorham place as the west half of the east half of south half of lots 1, 2, and 3 Coit & Curtis partition plat. The White place as the west half of the south half of lots 1, 2, and 3, Coit & Curtis partition plat. D. A. Blodgett property as lots 78 and 79, block 5, Kendall's addition. The Worden place is lot 6 and south 30 feet lot 5, block 5, Kendall's addition. The Rood place is the south 44 feet of lot 4 and north 56 feet of lot 5, block 5, Kendall's addition. The

Stickley place is lot 3, block 5, and north 32 feet of lot 4, block 5, Kendall's addition. The E. G. Studley place is lot 2 and the south 50 feet of lot 1, block 5, Kendall's addition. The Berkey place is the north 100 feet of lot 1, block 5, Kendall's addition. The Crosby property is lot 2 and east half of a 9-foot vacated alley on the west in block 4, Kendall's addition. The Methodist parsonage, that part of block 3, Kendall's addition commencing 82.5 feet south of the northwest corner of said block 3, south 52 feet, east 130 feet. The Hoffman flats is the north 55 feet of lot 4, block 26, Campau's addition. The Sisters of St. Dominic is lots 1 and 2 and east half of lot 3, block 23, Campau's addition. The Birch property is lots 10 and 11, block 23, Campau's addition. Park Congregational Church is lots 1, 2, 3, 4, and 5 of block 22 of same addition. The Evening Press property is lot 1 and the east 12 feet of lot 4, block 16, Bostwick & Co.'s addition. The Herald building is the west 36 feet of lot 4 and east 24 feet of lot 5, the west 10 feet of the east 34 feet of north 62.5 feet of lot 5, block 16, Bostwick & Co.'s addition. Mrs. Watson is lots 9 and 12 and the west 10 feet of lot 8, block 13, Bostwick & Co.'s addition. Blake & Maris property is lot 9, block 2, Bostwick & Co.'s addition. The Wellington flats is the south 40 feet of lot 1, south 40 feet of east 8 feet of lot 4, and west 43 feet of lot 4 and the east 2 feet of lot 5, block 2, Bostwick & Co's addition. Mrs. Luton's property is the south 40 feet of the north 120 feet of lot 1 and the south 40 feet of the north 12.0 feet of the east 8 feet of lot 4, block 2, Bostwick & Co.'s addition. The Luce property is part of the N. E. ¼ of the S. W. ¼ section 30—7—11, commencing at the S. E. corner of East Fulton street and Jefferson avenue, south 178 feet, east 132 feet, north 178.5 feet, west 132 feet to beginning. The Platte property is part of N. E. ¼ of the S. W. ¼ of section 30—7—11, commencing on the south line East Fulton street east of the east line of Jefferson avenue, south 297 feet, east 82 feet, north 297 feet, west 82 feet to beginning. The A. W. Pike property is part of the N. E. ¼ of the S. W. ¼ section 30—7—11, commencing 18 rods east and 2 rods south of the N. W. corner of that 40, south 297 feet, east 132 feet, north 297 feet, west 132 feet to beginning. The M. L. Sweet place is part of the N. E. ¼ of the S. W. ¼ section 30—7—11, commencing on the south line of East Fulton street 26 rods east and 2 rods south of the N. W. corner of that 40,

south 136$\frac{10}{12}$ feet east to the west line of South Lafayette street, north to the south line of East Fulton street and west to beginning. The Peter P. Steketee property is lots 1 and 2 except the south 3 feet of Mintu's subdivision of part of block 2 of Campau's addition. The Morman property is lot 2 and the north 30 feet of west 62.93 feet of lot 3, Gay's subdivision. The Aldworth property is lot 1 and the north 40 feet of lot 3 except the north 30 feet of the west 62.93 feet of lot 3, Gay's subdivision. The Leonard property is part of the N. W. $\frac{1}{4}$ of the S. W. $\frac{1}{4}$ of section 30—7—11, commencing on the south line of East Fulton street and the east line of block 1, Campau's second addition, west 100 feet, south 250 feet, west 100 feet, north 250 feet to beginning.

"There is another house that is divided by this district line, and that is the residence of Silas F. Godfrey's family. That is described as lots 1 and 6, block 22, Campau's addition. The Wenham block is also divided by this line, and that is described as lot 5, block 21, Campau's addition, except north 44 feet of lot 6, block 21, Campau's addition, except south 21 feet, a part of lot 6, block 21, Campau's addition, commencing 21 feet north of the south line of said lot 6, south along east line of North Division street to northerly line of Monroe street, southeasterly on said northerly line 45 feet, northeasterly at right angles with Monroe street 70 feet, west to beginning.

"That covers the description of all the property all portions of which are omitted from this district."

From this and other testimony we feel obliged to agree with the trial judge in the conclusion that the boundaries of the district were fixed by the common council without reference either to known or ascertainable facts; that the action was arbitrary and unwarranted. We are of opinion, also, that the bill of complaint, fairly interpreted, charges the creation of a district invalid because not including lands benefited by the improvement.

2. It appears that the expense of the improvement was apportioned to property within the assessment district in accordance with area, the tax amounting in each instance to substantially 9.6 mills per square foot. We can understand that natural drainage should be taken into account in fixing the limits of a special assessment district and in

the apportionment of benefits in a city where the sewers serve the purpose for which storm drains separate from sewers are sometimes constructed; but we should expect, and we think reason demands, that property benefited otherwise than by surface drainage should be considered as enjoying an additional benefit and advantage on account of the sewer. Some of the property assessed appears to be so situated that its surface drainage is to the sewer, but no connection can be made with the sewer or any lateral thereof without crossing other private property. Such property is, however, assessed at the same rate as property immediately fronting upon the street in which the sewer is constructed.

We shall not attempt to lay down a rule for determining the benefits accruing to property by reason of a special improvement like a sewer. It is likely that no rule could be formulated. Some things in connection therewith, however, appear to us to be reasonably clear. The benefit accruing to an owner of property when a sewer is constructed in the street upon which the property abuts does not necessarily depend upon the use to which the property is devoted. An owner of vacant property abutting upon a sewer is benefited by the construction of the sewer and perhaps quite as much so as if there were standing upon his land an apartment house housing a large number of people, since, with the sewer once laid, his property may be devoted to the housing of any number of people which it will contain. Nor are we impressed with the argument that the owner of an apartment house on property abutting upon a sewer is more greatly benefited by the sewer than would be the owner of a dwelling upon the same property; or, that a dwelling costing $100,000 is more greatly benefited than one costing $10,000 on account of the equal right and convenience of connection with the sewer. In whatever way these considerations may affect the judgment of those charged with the duty of apportioning the cost of the sewer to the owner of benefited property, it is clear that an apportionment upon the basis of

the area of the property is not, in this case, an apportionment which is in proportion, as nearly as may be, to the advantage which each owner acquires or obtains. The apportionment is wrong because the theory and method of apportionment was wrong. Whether we call the action of the assessors a mistake, or an abuse of discretion, the result is the same, and the legal injury to complainants is apparent. *Auditor General* v. *O'Neill,* 143 Mich. 343 (106 N. W. 895). See, also, *Auditor General* v. *Bishop,* 161 Mich. 117 (125 N. W. 715). The fact that the certificate of the assessors recites that an assessment in accordance with benefits was made, and the further fact that the council finally confirmed the roll, are not in such a case conclusive.

3. In August, 1905, in accordance with a request preferred by the council, the board of public works reported the estimated cost of the improvement. In October of the same year, the improvement was declared to be a necessary one. A contract for its construction was approved September 17, 1906. In July, 1907, the estimated cost of the improvement, being $10,697, was ordered to be apportioned within the district theretofore fixed, and in the same month the board of assessors returned and filed the assessment roll. A day was fixed for hearing appeals from the said action of the assessors and notice thereof was given by publication in a newspaper published in the city. It is required by the charter, and was ordered by the council, that the said notice contain the names of those assessed. This notice was given. It did not contain the names of all owners of property assessed, because in some instances the wife of the person named therein, and in the roll, was the owner of the property; in others, the property was owned by the husband and wife by entireties and only the name of the husband was given. Twenty-nine or more persons appealed to the common council, among them eight of the complainants. It does not appear that all stated the same grounds for appealing and none of

166 MICH.—10.

them questioned the action of the council fixing the assessment district except that four of the complainants stated that the district did not include all of the property benefited. Some changes were made in the roll by the council by diminishing certain assessments and adding the amount to other assessments. The roll was thereafter confirmed. The assessors certified that the roll was made in accordance with the resolution and direction of the council and according to benefits. It is said that no fraud or favoritism has been shown and that in view of the certificate of the assessors and of the settled law the courts may not review the matter. This point has already been disposed of favorably to the appellees. It is to be noticed, however, that the changes made in the roll by the common council affecting a few of the assessments leave it wholly uncertain upon what basis, or according to what theory, that portion of the expense of the improvement is levied. As to the remainder there is and can be no dispute. It was considered by the assessors that an assessment according to drainage area was an assessment according to benefits, within the meaning of the charter, and the assessment is so laid.

There is no provision of law for appealing from the action of the common council fixing a special assessment district. It is not possible for complainants to compute, and so to tender, or offer to pay, a proper assessment. We hold, therefore, that the complainants not appealing from the assessment roll are not estopped to question the assessment in this proceeding, and that the failure to pay or offer to pay any part of the cost of the improvement is excused. Nor do complainants occupy the position of taxpayers who stand by without complaining until they have received the benefit of a public improvement and thereby estop themselves to question the cost thereof apportioned to them. None of the complainants had property fronting on the sewer. Assuming that they were aware that the sewer was being reconstructed at the expense of taxpayers, it appears that the improvement was

completed in the summer of 1907 and no notice of the creation of the special district was given until July 15, 1907. That is to say, the complainants could not know, until at or about the time the improvement was completed, how they would be affected, if affected at all, by the action of the public authorities.

There are some other questions argued in the brief for appellant which, in view of the rulings indicated, and the probability that a new district and a new roll will be made, do not require discussion.

We affirm the decree of the circuit court, with costs to appellees.

BIRD, BROOKE, BLAIR, and STONE, JJ., concurred.